PAUL H. ACHITOFF          #5279
KYLIE W. WAGER CRUZ       #10165
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawaiʻi 96813
Telephone No.: (808) 599-2436
Fax No.: (808) 521-6841
Email: achitoff@earthjustice.org
      kwager@earthjustice.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAIʻI

| | |
|---|---|
| NA KIAʻI KAI, an unincorporated association, SURFRIDER FOUNDATION, a non-profit corporation, and PESTICIDE ACTION NETWORK NORTH AMERICA, a non-profit corporation,<br><br>    Plaintiffs,<br><br>  v.<br><br>JAMES NAKATANI in his official capacity as Executive Director of the STATE OF HAWAIʻI AGRIBUSINESS DEVELOPMENT CORPORATION,<br><br>    and<br><br>STATE OF HAWAIʻI DEPARTMENT OF HEALTH,<br><br>    Defendants. | Civil No. 18-00005<br><br>PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; EXHIBIT A |

PLAINTIFFS' COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

INTRODUCTION

1.      Defendant James Nakatani, in his official capacity as Executive

Director of the Agribusiness Development Corporation ("ADC Director") has been

violating, and continues to violate, the Federal Water Pollution Control Act, also

known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251–1388, by directing,

enabling, and allowing ADC to discharge polluted drainage waters from the Mānā

Plain drainage canal system that ADC owns, operates, and maintains, including but

not limited to the canals, two pumping stations, and seven drainage ditch outfalls in

West Kauaʻi, Hawaiʻi (the "drainage ditch system" or "system") without the

National Pollutant Discharge Elimination System ("NPDES") permit the CWA

requires.  Plaintiffs Na Kiaʻi Kai, Surfrider Foundation, and Pesticide Action

Network North America ("PAN"), are informed and believe and on that basis

allege that ADC, under the direction of the ADC Director, continuously or

intermittently discharges system drainage waters into jurisdictional waters.

Plaintiffs are further informed and believe and on that basis allege that these

unpermitted discharges began at least as early as August 3, 2015, have continued to

the present, and, absent the ADC Director's action, on behalf of ADC, to comply

with the CWA, will continue.

2.      ADC's pollution in and from the drainage ditch system, under the

direction of the ADC Director, has had detrimental effects on, and poses an

ongoing threat to, the water quality and health of the West Side waters and ecosystem, particularly at Barking Sands Beach, Majors Bay, MacArthur Beach Park, and Kīkīaʻola Harbor, and the drained areas of West Kauaʻi, where scientific testing has shown the presence of harmful pollutants, including pesticides, in the drainage ditch waters.

3.    The system drainage waters contain pollutants including, but not limited to, pesticides (including atrazine, bentazon, chlorpyrifos, cis-propiconazole, fipronil, glyphosate, hexazinone, MCPA, metolachlor, simazine, trans-propiconazole), nitrate-nitrite, nitrogen, phosphorus, chlorophyll, turbidity, suspended solids, pH, metals (such as arsenic, barium, cadmium, chromium, copper, lead, mercury, nickel, silver, zinc), phenols, sulfide, antimony, beryllium, selenium, thallium, and bis-phthalate.

4.    Plaintiffs are informed and believe and on that basis allege that pollution levels in and from the drainage ditch system violate state water quality standards.

5.    The drainage ditch system discharges millions of gallons per day into jurisdictional waters, or waters of the United States.

6.    The NPDES program regulates discharge of pollutants from drainage ditch systems into waters of the United States.  33 U.S.C. § 1342; 40 C.F.R. pt. 122.

7.     ADC, under the direction of the ADC Director, does not have an NPDES permit regulating its discharges from the drainage ditch system.  The ADC Director, through ADC, therefore is in violation of the CWA.  *Id.* § 1311(a).

8.     Additionally, defendants ADC Director, through ADC, and the Hawaiʻi Department of Health ("DOH") are breaching their public trust duties to conserve and protect water resources, including nearshore marine and inland waters, under article XI, §§ 1 and 6 of the Hawaiʻi Constitution.

9.     By this complaint, plaintiffs seek a declaratory judgment that the ADC Director, through ADC, has been and will continue to violate the CWA unless and until the ADC Director, on behalf of ADC, obtains and complies with the terms of a valid NPDES permit.  Plaintiffs additionally seek an injunction requiring the ADC Director, on behalf of ADC, to promptly apply for, obtain, and comply with the terms of an NPDES permit to eliminate ongoing illegal discharges.  Plaintiffs also seek imposition of maximum civil penalties for the defendant ADC Director's violations, through ADC, of the CWA.

10.     Plaintiffs also seek a declaratory judgment that the ADC Director, through ADC, has breached and continues to breach his public trust duties by failing to obtain and comply with the terms of a valid NPDES permit, or alternatively, by failing to protect nearshore marine and inland waters from its nonpoint source pollution; and by violating state water quality standards.  Plaintiffs

3

seek an injunction requiring the ADC Director, on behalf of ADC, to promptly apply for, obtain, and comply with the terms of an NPDES permit, or alternatively, reduce, control, and mitigate its nonpoint source pollution; and comply with state water quality standards.

11.    Plaintiffs further seek a declaratory judgment that DOH has breached, and continues to breach its public trust duties by aiding, abetting, and facilitating the ADC Director's failure to obtain, on behalf of ADC, an NPDES permit, or alternatively, by failing to protect nearshore marine and inland waters from nonpoint source pollution; and by failing to ensure compliance with state water quality standards.  Plaintiffs seek an injunction requiring DOH to direct the ADC Director, on behalf of ADC, to apply for, obtain, and comply with the terms of a valid NPDES permit, or alternatively, requiring DOH to reduce, control, and mitigate nonpoint source pollution; and requiring DOH to ensure compliance with state water quality standards.

## JURISDICTION AND VENUE

12.    Plaintiffs bring this lawsuit pursuant to the CWA, 33 U.S.C. §§ 1251–1388, among other laws.  This Court has subject matter jurisdiction over the CWA claims for relief set forth herein pursuant to 33 U.S.C. § 1365(a) (citizen suits to enforce effluent standards or limitations under the CWA), 28 U.S.C. § 1331

(actions arising under the laws of the United States), and 28 U.S.C. §§ 2201-02 (power to issue declaratory judgments in cases of actual controversy).

13.    Between October 30 and November 6, 2017, plaintiffs gave written notice of the violations set forth in this complaint, and of their intent to file suit on these CWA claims, to the Environmental Protection Agency ("EPA") Administrator, EPA Region IX, the Governor of the State of Hawaiʻi, DOH, and the ADC Director.  33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(2).  Plaintiffs' sixty-day notice letter and certified mail return receipts are attached hereto as "Exhibit A."

14.    At least sixty days have elapsed since plaintiffs served notice of their intent to sue.  *Id.*  Neither the EPA nor DOH has commenced or is diligently prosecuting a civil or criminal action in a court of the United States or a state to require the ADC Director, on behalf of ADC, to obtain an NPDES permit or otherwise address the violations plaintiffs alleged in this complaint.  *Id.* § 1365(b)(1)(B).

15.    Defendant ADC Director, on behalf of and through ADC, has failed to obtain and comply with the terms of an NPDES permit for the ongoing discharges of drainage waters and pollutants from the drainage ditch system into waters of the United States, and these CWA violations will persist on a continuous or

intermittent basis until the ADC Director, on behalf of ADC, obtains an NPDES permit and complies with permit limits designed to protect water quality.

16.     ADC's unpermitted discharges, under direction of the ADC Director, began on or about August 3, 2015, and have continuously or intermittently travelled to jurisdictional waters.  Because ADC, under the direction of the ADC Director, discharges millions gallons of polluted drainage waters daily, the violations are likely to continue unless and until defendant ADC Director, on behalf of ADC, obtains and complies with the terms of a valid NPDES permit.

17.     Venue properly lies in this judicial district under CWA section 505(c)(1), *id.* § 1365(c)(1), because the source of the violations at issue is located within this judicial district.

18.      Plaintiffs also bring this lawsuit against defendants ADC Director and DOH pursuant to article XI, §§ 1 and 6 of the Hawaiʻi Constitution.  This Court has subject matter jurisdiction over the article XI, §§ 1 and 6 claims for relief set forth herein pursuant to 28 U.S.C. § 1367(a) (supplemental jurisdiction).

19.     By causing or failing to address pollution in and from the drainage ditch system, the ADC Director, through ADC, and DOH are breaching their public trust duties to conserve and protect Hawaiʻi's water resources, including nearshore marine and inland waters, under article XI, §§ 1 and 6.

PARTIES

A.    <u>Plaintiffs</u>

20.    Plaintiff Na Kia'i Kai is a community-based organization established by West Kaua'i residents, including Native Hawaiian fishers and cultural practitioners, to protect West Kaua'i coastal waters, humans, and aquatic life from pollution.  Na Kia'i Kai's members live, work, recreate, and practice their culture in and around West Kaua'i, and extensively use West Kaua'i waters for subsistence fishing to feed their families, as they have done for generations, as well as swimming and surfing.  A healthy nearshore ocean environment and good water quality are essential for Na Kia'i Kai members to participate in these activities. Their kūpuna, or ancestors, have passed down stories about the abundance of limu and spawning areas for fish that no longer exist.

21.    Plaintiff Surfrider Foundation is a non-profit environmental organization dedicated to the protection and enjoyment of the world's ocean, waves, and beaches through a powerful network.  Surfrider Foundation has over 250,000 supporters, activists and members, including hundreds of Kaua'i residents and people who visit Kaua'i regularly.  Surfrider Foundation members use the nearshore waters along the West Kaua'i coastline, including the Barking Sands

Beach, Majors Bay, MacArthur Beach Park, and Kīkīaʻola Small Boat Harbor areas, for activities such as surfing, swimming, stand-up paddling, snorkeling, and SCUBA diving.  A healthy nearshore ocean environment and good water quality are essential for Surfrider Foundation members to participate in these activities.

22.     Surfrider Foundation Kauaʻi Chapter has an integrated campaign to protect the island's watershed and coastal resources, especially through testing and notifying the public of water pollution issues.  The Chapter has worked with state and federal agencies to improve water quality and relay its water quality testing results.  The Chapter is highly concerned about the presence of pesticide pollution, which is at issue in this case.  The Chapter is promoting Surfrider Foundation's quintessential program of "Clean Water" to promote healthy coasts and protect water quality in Hawaiʻi.

23.     Over the past several years, Surfrider Foundation members have taken and analyzed samples of nearshore ocean and stream water around the island. Surfrider Foundation has specifically tested the waters in the drainage ditch system at issue in this case due to concerns about water quality in West Kauaʻi.

24.     PAN is an Oakland, California-based, nonprofit corporation that serves as an independent regional center of Pesticide Action Network International, a coalition of public interest organizations in countries around the world.  For over thirty years, PAN has worked to replace the use of hazardous pesticides with

healthier, ecologically-sound and socially just alternatives.  PAN works with more than 100 partner organizations in North America to provide scientific and technical expertise, access to pesticide data and analysis, policy development, communications strategy, and coalition organizing support to affected communities.  PAN has more than 110,000 members across the United States, including over 1,300 in the County of Kaua'i.

25.     PAN's members live, work, and recreate near the areas affected by the polluted drainage waters, and use the nearshore waters along the West Kaua'i coastline, including the Barking Sands Beach, Majors Bay, MacArthur Beach Park, and Kīkīa'ola Small Boat Harbor areas, for activities such as surfing, swimming, stand-up paddling, snorkeling, and SCUBA diving.  A healthy nearshore ocean environment and good water quality are essential for PAN members to participate in these activities without compromising their health or that of their children.

26.     The ADC Director's operation, through ADC, of the drainage ditch system in violation of the CWA and Haw. Const. art. XI, §§ 1 and 6, DOH's failure to address such violations, and the resulting pollution in and from the system have adversely affected and continue to adversely affect the environmental, aesthetic, recreational, scientific, and educational interests of Na Kia'i Kai, Surfrider, and PAN.  Unless the relief requested herein is granted, plaintiffs will continue to be irreparably injured by the ADC Director's illegal pollution, through

ADC, and DOH's failure to address such pollution, as detailed below.  Plaintiffs

bring this action on behalf of themselves and their adversely affected members.

> B.     Defendants

27.     ADC is the owner and operator of the drainage ditch system.

Plaintiffs are informed and believe, and on the basis thereof allege, that ADC has

owned and operated the drainage ditch system at all times that the violations

alleged in this complaint have taken place, and continue to take place.

28.     Defendant James Nakatani, or the "ADC Director," is sued in his

official capacity as Executive Director of ADC.  Haw. Rev. Stat. ("H.R.S.") §

163D-3(d).  The ADC Director is responsible for ensuring that discharges from the

drainage ditch system comply with the CWA.  If ordered by the Court, the ADC

Director has the authority and ability to remedy the harm inflicted by discharges

from the drainage ditch system in violation of the CWA.

29.     Defendant ADC Director is a "person" under CWA section 505(a)(1),

33 U.S.C. § 1365(a)(1).

30.     Defendant ADC Director, on behalf of and through ADC, is a trustee

of Hawaiʻi's water resources under article XI, §§ 1 and 6 of the Hawaiʻi

Constitution.

31.     Defendant DOH is a state agency and trustee of Hawaiʻi's water

resources under article XI, §§ 1 and 6 of the Hawaiʻi Constitution.

10

## STATUTORY BACKGROUND

<u>The Clean Water Act</u>

32.     In 1972, Congress enacted the Federal Water Pollution Control Act,
known as the Clean Water Act, to "restore and maintain the chemical, physical,
and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  To further
this central goal, section 301(a) of the CWA prohibits "the discharge of any
pollutant" into the nation's waters, except when specifically authorized under the
CWA.  *Id*. § 1311(a).

33.     The CWA defines the term "pollutant" broadly to include "dredged
spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions,
chemical wastes, biological materials, radioactive materials, heat, wrecked or
discarded equipment, rock, sand, cellar dirt and industrial, municipal, and
agricultural waste discharged into water." *Id*. § 1362(6).

34.     The CWA defines "discharge" to include "any addition of any
pollutant to navigable waters from any point source." *Id*. § 1362(12).

35.     The CWA defines "navigable waters" to include "waters of the United
States, including the territorial seas." *Id*. § 1362(7).

36.     The CWA defines "territorial seas" as "the belt of the seas measured from the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters, and extending seaward a distance of three miles." *Id*. § 1362(8).

37.     The CWA defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit . . . from which pollutants are or may be discharged." *Id*. § 1362(14).

38.     Section 402(a) of the CWA, *id*. § 1342(a), authorizes the issuance of NPDES permits to allow persons to discharge limited quantities of pollutants into surface waters from point sources, where appropriate.  The NPDES program is designed to protect the quality of surface waters.  Without an NPDES permit, a person may not discharge to waters of the United States from a point source without being subject to enforcement action and fines.  *Id*. §§ 1311(a), 1319; 40 C.F.R. § 19.4.

39.     CWA section 402(b), 33 U.S.C. § 1342(b), gives the EPA Administrator authority to allow a state to administer its own NPDES program.  In the state of Hawaiʻi, the EPA has delegated authority to DOH to issue NPDES permits.  33 U.S.C. § 1342(b); 40 C.F.R. § 123.24.  A state-issued NDPES permit can impose effluent limits and other provisions that are more stringent than the federal requirements for an NPDES permit, but all provisions must be at least as

stringent as the federal requirements.  40 C.F.R. § 123.25(a); Haw. Admin. R.

("H.A.R.") § 11-55-02(c).

40.    Federal or state agencies administering the NPDES program are

required to ensure compliance with a variety of CWA provisions – including state

water quality standards, which incorporate water body use classifications, water

quality criteria, and anti-degradation requirements – and ultimately make a

determination whether a discharge permit will be issued and, if so, the quantities of

pollutants permitted in that discharge.

41.    The CWA requires that waters in each state be assigned use

classifications that determine the types of uses a particular water body should be

able to support.  40 C.F.R. § 131.10(a)-(b).  Classifications of water bodies must

take into account uses such as "recreation in and on the water" and "protection and

propagation of fish, shellfish and wildlife," among others.  *Id*. § 131.10(a).

Administrative rules determine the use classifications of water bodies in Hawai‘i,

including those for marine waters.  H.A.R. §§ 11-54-2 (classification of state

waters), 11-54-3 (classification of water uses).

42.    DOH, the state agency charged with setting water quality standards,

has designated the waters at and near the outfalls as Class A, open coastal marine

waters.  *Id*. § 11-54-6(a)(2)(B).  Protected uses in the area include aesthetic

enjoyment and recreation.  *Id*. § 11-54-3(c)(2).  Any other use must be "compatible

with the protection and propagation of fish, shellfish, and wildlife, and with recreation in and on these waters." *Id*. Class A waters "shall not act as receiving waters for any discharge which has not received the best degree of treatment or control compatible with the criteria established for this class." *Id*.

43.     DOH has also established a classification for inland waters, including "[d]itches and flumes that discharge into any other waters of the State." H.A.R. § 11-54-2(b)(1)(A)(iii). The drainage ditch system is classified as Class 2 freshwater. *Id*. § 11-54-5.1(a)(1)(C). Protected uses include recreation, "the support and propagation of aquatic life," and "all uses compatible with the protection and propagation of fish, shellfish, and wildlife, and with recreation in and on these waters." *Id.* § 11-54-3(b)(2). Class 2 freshwater "shall not act as receiving waters for any discharge which has not received the best degree of treatment or control compatible with the criteria established for this class." *Id*.

44.     Along with establishing use classifications, states establish water quality criteria designed to protect the designated uses assigned to a particular body of water. 40 C.F.R. § 131.11(a). The criteria can be either narrative, which describe qualitative conditions, or numeric, which set quantitative limits for certain pollutants. *Id*. § 131.11(b).

45.     H.A.R. § 11-54-4 contains narrative and numeric water quality criteria that apply to all waters, including Class A marine waters and ditches such as the

14

drainage ditch system.  *See* H.A.R. § 11-54-5.2(a) (H.A.R. § 11-54-4 criteria apply to ditches).  H.A.R. § 11-54-6(b)(3) contains numeric water quality criteria that apply to open coastal waters.

46.     In Hawaiʻi, narrative criteria require that, among other things, "[a]ll waters shall be free of substances attributable to domestic, industrial, or other controllable sources of pollutants, including:  (1) Materials that will settle to form objectionable sludge or bottom deposits; (2) Floating debris, oil, grease, scum, or other floating materials; (3) Substances in amounts sufficient to produce taste in the water or detectable off-flavor in the flesh of fish, or in amounts sufficient to produce objectionable color, turbidity or other conditions in the receiving waters; (4) High or low temperatures, biocides, pathogenic organisms, toxic, radioactive, corrosive, or other deleterious substances at levels or in combinations sufficient to be toxic or harmful to human, animal, plant, or aquatic life, or in amounts sufficient to interfere with any beneficial use of the water; (5) Substances or conditions or combinations thereof in concentrations which produce undesirable aquatic life; and (6) Soil particles resulting from erosion on land involved in earthwork, such as the construction of public works; highways; subdivisions; recreational, commercial, or industrial developments; or the cultivation and management of agricultural lands."  H.A.R. § 11-54-4(a).

47.     The numeric criteria establish limits for a variety of pollutants including, but not limited to, nitrate-nitrite, nitrogen, phosphorous, chlorophyll, turbidity, arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, zinc, phenols, antimony, beryllium, selenium, and chlorpyrifos.  *Id*. §§ 11-54-4(c)(3), 11-54-6(b)(3).

48.     In addition to narrative and numeric criteria, "ocean discharge criteria" must be applied when establishing NPDES permit limits for discharges into the territorial sea or ocean.  33 U.S.C. § 1343(a).  Pursuant to federal regulations, the agency drafting an NPDES permit must determine "whether a discharge will cause unreasonable degradation of the marine environment," based on numerous factors, including "[e]xisting or potential recreational and commercial fishing, including finfishing and shellfishing," and "[t]he potential impacts on human health through direct and indirect pathways."  40 C.F.R. § 125.122(a).  Agencies issuing NPDES permits for discharges into the ocean must ensure that any discharges will not unreasonably degrade the marine environment or, in situations where the director does not have sufficient information to make that determination, must require that the permittee comply with specified permit conditions while the director gathers necessary information; otherwise, the permit cannot be issued.  *Id*. § 125.123(a)-(d).

49.     The CWA and implementing regulations further set forth minimum requirements for states to establish an anti-degradation policy, which is intended to protect waters from activities that could lower water quality.  *Id*. § 131.12(a). Hawaiʻi's anti-degradation regulations require that, at a minimum, "[e]xisting uses and the level of water quality necessary to protect the existing uses shall be maintained and protected."  H.A.R. § 11-54-1.1(a).

50.     In Hawaiʻi, "[n]o person, including any public body, shall discharge any water pollutant into state waters, or cause or allow any water pollutant to enter state waters" except in compliance with the state's water pollution regulations. H.R.S. § 342D-50(a); *see* also H.A.R. § 11-55-03.

51.     DOH has promulgated procedural requirements to apply for, obtain, and renew an NPDES permit in Hawaiʻi.  *See* H.A.R. ch. 11-55.  DOH is charged with assessing applications for NPDES permits and determining the limits in NPDES permits based on, among other things, the nature of the discharge from the facility and the state water quality standards in the receiving water body.  *Id*. § 11-55-15.  "It is the public policy of [the State of Hawaiʻi] . . . [t]o provide that no waste be discharged into any state waters without first being given the degree of treatment necessary to protect the legitimate beneficial uses of the waters."  *Id*. § 11-55-02(a)(3).

52.     Facilities proposing to discharge generally must submit an application for an NPDES permit at least 180 days <u>prior</u> to the date when the discharge is scheduled to commence or an existing NPDES permit will expire.  40 C.F.R. § 122.21(c)(1), (d); H.A.R. §§ 11-55-04(a)(1), 11-55-27(a).

53.     In Hawaiʻi, state regulations create a mechanism for DOH to impose strict monitoring and reporting requirements on NPDES permittees to ensure compliance with the permit's discharge limits and conditions.  H.A.R. §§ 11-55-28 to -31.

<u>The State's Public Trust Duties</u>

54.     Under article XI, §§ 1 and 6 of the Hawaiʻi Constitution, the ADC Director, on behalf of and through ADC, and DOH, as agents of the state, have public trust duties to conserve and protect waters of the state, including nearshore marine and inland waters, for present and future generations in Hawaiʻi.

55.     The Hawaiʻi legislature has further implemented these constitutional provisions by granting DOH broad powers to prevent and remedy pollution from point and nonpoint sources under H.R.S. chapters 342D and 342E.

56.     Under H.R.S. chapter 342D, DOH "shall prevent, control, and abate water pollution in the State."  H.R.S. § 342D-4.  DOH's duties and powers to prevent and remedy water pollution are further established throughout chapter 342D.  *See, e.g.*, *id.* §§ 342D-6 (permits), -8 (inspection of premises), -9

(enforcement), -11 (injunctive ad other relief), -30 (civil penalties), -31 (administrative penalties), and -56 (complaints and hearings).

57.     H.R.S. chapter 342E applies specifically to nonpoint source pollution and requires DOH to "[r]educe, control, and mitigate nonpoint source pollution in the State." *Id.* § 342E-3(a)(1).  Chapter 342E further requires DOH to monitor and update the list of waters that cannot reasonably be expected to attain or maintain state water quality standards; identify nonpoint sources that add significant pollution to those waters; and facilitate implementation of the best management practices, programs, and measures to control that pollution.  *Id.* § 342E-3.  Any person who violates nonpoint source pollution statutes or administrative rules must be fined with civil penalties.  *Id.* § 342E-4.

58.     Under DOH's administrative rules, DOH "shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources and all cost-effective and reasonable best management practices for nonpoint source control."  H.A.R. § 11-54-1.1(b).

## BACKGROUND FACTS

59.     In the early 1920s, the Kekaha Sugar Company developed a drainage ditch system on the Mānā Plain to lower the water table.  In 2001, the Kekaha Sugar Company closed, and in 2003, the governor transferred approximately 12,500 acres of agricultural lands formerly in sugar cultivation from the Hawaiʻi

Department of Land and Natural Resources to ADC.  ADC also assumed

ownership and management of the drainage ditch system and Kekaha Sugar

Company's NPDES permit regulating discharges from the system.

60.    The ADC Director, on behalf of ADC, renewed ADC's NPDES

permit in February 2007, and submitted a permit renewal application on or about

February 25, 2011.

61.    The ADC Director, on behalf of ADC, withdrew ADC's application to

renew its NPDES permit on or about August 3, 2015.

62.    Plaintiffs are informed and believe and on that basis allege that

defendant DOH has been aiding, abetting, and facilitating ADC's continuous or

intermittent discharges of polluted waters from the drainage ditch system into

waters of the United States without an NPDES permit.

63.    At all relevant times, ADC has owned and operated the drainage ditch

system on the West Side of Kaua'i.  The system includes, but is not limited to,

forty miles of drainage canals and ditches, several storage reservoirs, two pumping

stations (the "Kawai'ele Pumping Station" and "Nohili Pumping Station"), and

seven outfalls.  The seven outfalls are the Kūkai Ditch, Kawai'ele Outfall (or

"Kinikini Ditch"), Nohili Outfall, Kīkīa'ola Harbor Drain, Cox Drain, First Ditch,

and Second Ditch, referred to as Outfall Serial Nos. 1 through 7, respectively, in

ADC's former NPDES permit.  Plaintiffs are informed and believe and on that

basis allege that ADC, under the direction of the ADC Director, first began discharging drainage waters from the system without a permit on or about August 3, 2015, and has continuously or intermittently discharged drainage waters from the system from on or about August 3, 2015 to the present.

64.    Plaintiffs are informed and believe and on that basis allege that ADC's activities at the drainage ditch system, under the direction of the ADC Director, involve the discharge of approximately 20-30 million gallons of drainage water per day into jurisdictional waters of West Kaua'i.

65.    Plaintiffs are informed and believe and on that basis allege that the discharged drainage waters do not constitute agricultural stormwater discharges or return flows from irrigated agriculture.

66.    Facilities on Mānā Plain lands the drainage ditch system drains include genetically engineered seed crops and associated buildings, the Pacific Missile Range Facility, Sunrise Capital Shrimp Farm, Kekaha Landfill, the former Kekaha Sugar Mill, Waimea Wastewater Treatment Plant, Kaua'i Raceway Park, an asphalt plant, a sand mining operation, and a composting facility.

67.    Plaintiffs are informed and believe and on that basis allege that pollution in and from the drainage ditch system violates water quality standards, including those set forth in H.A.R. §§ 11-54-4, 11-54-5.2, and 11-54-6.

68.     In May 2014, DOH released the draft 2013-14 State Wide Pesticide Sampling Pilot Project Water Quality Findings, a joint investigation by DOH and the Hawaiʻi Department of Agriculture.  Data from the study provides preliminary information about the presence of pesticide residue in the state's surface waters. The draft study included atrazine, metolachlor, glyphosate, chlorpyrifos, and other pesticides found in samples from various locations throughout the state.  Some samples were taken downstream of West Kauaʻi agrochemical company operations, including from ditch system waters near the Kawaiʻele Pumping Station, the Kīkīaʻola Harbor Drain, and Second Ditch.  DOH's sampling efforts showed the presence of atrazine and metolachlor at all three locations, glyphosate in the ditch waters near the Kawaiʻele Pumping Station, and chlorpyrifos at Second Ditch.  The samples also showed the presence of bentazon, cis-propiconazole, and trans-propiconazole at the Kīkīaʻola Harbor Drain and Second Ditch; fipronil and simazine at the Kīkīaʻola Harbor Drain; and hexazinone and MCPA at Second Ditch.

69.     The atrazine and metolachlor in samples from the Kīkīaʻola Harbor Drain exceeded aquatic life benchmarks.

70.     Atrazine, metolachlor, hexazinone, and simazine are restricted use pesticides, which are classified as such if they are "determined to be a health hazard," "can be reasonably anticipated to result in contamination of groundwater

or significant reductions in nontarget organisms, or fatality to members of endangered species," have certain levels of toxicity, or are categorized as restricted use pesticides under federal law.  H.A.R. § 4-66-32(b), (e).

71.     Atrazine can cause reproductive difficulties and cardiovascular problems in humans.  40 C.F.R. Pt. 141, Subpt. O, App. A; H.A.R. ch. 11-20 App. A.  According to the federal Department of Health and Human Services, Agency for Toxic Substances and Disease Registry ("ATSDR"), atrazine may affect pregnant women by slowing their babies' growth in the womb or by causing preterm births.  In pregnant animals, exposure to atrazine decreases fetal growth and causes birth defects and fetus mortality.  ATSDR warms that "[i]n areas of high atrazine use, individuals should avoid swimming in or drinking from contaminated water sources and may desire to have personal well water tested for the presence of atrazine," and that "[c]hildren should avoid playing in soils near uncontrolled hazardous waste sites where atrazine may have been discarded."

72.     Glyphosate is a broad spectrum herbicide, the active ingredient in the herbicide known as Roundup, which is used on glyphosate-resistant genetically engineered crops like those cultivated in West Kaua'i.  Glyphosate can cause reproductive difficulties and kidney problems in humans.  40 C.F.R. Pt. 141, Subpt. O, App. A; H.A.R. ch. 11-20 App. A.  In March 2015, the World Health

Organization International Agency on Research on Cancer classified glyphosate as Group 2A carcinogen, meaning it is "probably carcinogenic to humans."

73.     Chlorpyrifos is a pesticide commonly used on corn fields that can overstimulate the nervous system, causing nausea, dizziness, confusion, respiratory paralysis, and death.  It is also a developmental neurotoxicant, exposure to which can cause structural abnormalities and persistent neurobehavioral deficits.

74.     ADC's self-reported testing results to DOH on or about November 28, 2011.  The testing results show the presence of  nitrate-nitrite, nitrogen, metals (arsenic, barium, cadmium, chromium, copper, lead, mercury, nickel, silver, zinc), phenols, antimony, beryllium, selenium, and thallium at the Kawaiʻele Outfall, Nohili Outfall, and Second Ditch; phosphorus, chlorophyll, turbidity, suspended solids, pH, and sulfide at the Kawaiʻele and Nohili outfalls; and bis-phthalate at the Nohili Outfall and Second Ditch.

75.     Arsenic, cadmium, chromium, and beryllium are known human carcinogens; lead, nickel, and selenium are reasonably anticipated to be human carcinogens; and bis-phthalate can cause gastrointestinal distress in humans.

76.     The testing results indicate numerous potential exceedances of numeric criteria listed in H.A.R. § 11-54-4(c)(3).  For example, based on the amounts indicated in the testing data, at the Kawaiʻele Outfall, beryllium levels exceed the fish consumption criteria; copper levels exceed the freshwater acute and

chronic criteria and the saltwater acute and chronic criteria; nickel levels exceed the freshwater acute and chronic criteria and saltwater chronic criteria; and selenium levels equal the freshwater chronic criteria.  At the Nohili Outfall, copper levels exceed the saltwater acute and chronic criteria; nickel levels exceed the freshwater acute and chronic criteria and saltwater chronic criteria; and selenium levels equal the freshwater chronic criteria.  At Second Ditch, copper levels exceed the saltwater acute and chronic criteria; nickel levels exceed the freshwater acute and chronic criteria; and selenium levels equal the freshwater chronic criteria.

77.    In 2014, DOH reported to the EPA and Congress that the water quality offshore from the seven outfalls was not meeting state water quality standards for turbidity, at least one designated use was not being supported or was threatened, and a total maximum daily load for the waters was needed.

78.    The canals carrying these toxic pollutants run through populated areas and are not fenced off to keep children from playing in them or people from otherwise entering them.  They are not even posted with warning signs.

79.    The nearshore ocean waters adjacent to the outfalls are used extensively for aesthetic, recreational, cultural, and subsistence purposes.  The Kawaiʻele and Nohili outfalls intersect a sandy stretch known as Barking Sands Beach that extends several miles on either side of the outfalls.  The adjacent ocean waters are known as Majors Bay.  The Kūkai Ditch, Kīkīaʻola Harbor Drain, Cox

Drain, First Ditch, and Second Ditch are located further east along the Kaumualiʻi Highway near MacArthur Beach Park and Kekaha Town.  Community members, including Native Hawaiians, fish and gather limu in these areas, which are popular for fishing, surfing, swimming, and boating.

80.    The discharge of pollutants from the drainage ditch system without an NPDES permit harms these protected uses.

81.    Although the waters in the drainage ditch system contain dangerous pollutants, the ADC Director, on behalf of ADC, ended regulation and monitoring of the system under the NPDES program.  Instead, the ADC Director, on behalf of ADC, decided to pass off the environmental and social costs of the discharges to the public, while ending disclosure to the public of the pollutants its system continuously discharges into the public's water.

82.    These fragile marine waters, including, but not limited to, those in the Barking Sands Beach and the MacArthur Beach Park areas, will continue to be degraded by the continuous or intermittent discharges from the drainage ditch system unless and until the ADC Director, on behalf of ADC, is compelled to secure and comply with the terms of an NPDES permit, as required by the CWA.

83.    In addition, by breaching their public trust duties to conserve and protect nearshore marine and inland waters, the ADC Director, through ADC, and DOH harm protected uses of these waters.

CLAIM FOR RELIEF
(The ADC Director's Violations of the Clean Water Act by Directing, Enabling, and Allowing ADC to Discharge Without An NPDES Permit)

84.     Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 83 of this complaint.

85.     Defendant the ADC Director has violated and is violating section 301(a) of the CWA, 33 U.S.C. § 1311(a), and H.R.S. § 342D-50(a), which prohibit discharges of pollutants without an NPDES permit, by directing, enabling, and allowing ADC to continuously or intermittently discharge polluted waters from the drainage ditch system into waters of the United States without a permit.  Defendant ADC Director, through ADC, is subject to civil penalties under the CWA section 309(d), 33 U.S.C. § 1319(d), of up to $52,414 per day for each violation.  40 C.F.R. § 19.4, tbls. 1-2.

86.     Defendant ADC Director's violations, through ADC, of the above-listed statutes began on or about August 3, 2015, and continue up to the present. These violations will continue until defendant ADC Director, on behalf of ADC, obtains and complies with an NPDES permit for ADC's discharges.  33 U.S.C. §§ 1311(a), 1342.

## CLAIM FOR RELIEF
### (The ADC Director's Public Trust Violations)

87.    Plaintiffs reallege and incorporate by reference each and every

allegation contained in paragraphs 1 through 86 of this complaint.

88.    Defendant ADC Director, through ADC, is breaching his public trust

duties under Haw. Const. art. XI, §§ 1 and 6 by continuously or intermittently

discharging polluted waters from the drainage ditch system into waters of the

United States without a permit, in violation of H.R.S. § 342D-50(a).

89.    Alternatively, even if pollution in and from the drainage ditch system

did not require a permit, defendant ADC Director, through ADC, is breaching his

public trust duties under Haw. Const. XI, §§ 1 and 6 by failing to protect nearshore

marine and inland waters from its nonpoint source pollution.

90.    Regardless of whether pollution in and from the drainage ditch system

constitutes point or nonpoint source pollution, defendant ADC Director, through

ADC, is breaching his public trust duties under Haw. Const. XI, §§ 1 and 6 by

violating state water quality standards, including those set forth in H.A.R. §§ 11-

54-4, 11-54-5.2, and 11-54-6.


## CLAIM FOR RELIEF
### (DOH's Public Trust Violations)

91.    Plaintiffs reallege and incorporate by reference each and every

allegation contained in paragraphs 1 through 90 of this complaint.

28

92.     Defendant DOH is breaching its public trust duties under Haw. Const. art. XI, §§ 1 and 6, H.R.S. § 342D-4, and H.A.R. § 11-54-1.1(b) by aiding, abetting, and facilitating the ADC Director's continuous or intermittent discharges, through ADC, of polluted waters from the drainage ditch system into waters of the United States without a permit, in violation of H.R.S. § 342D-50(a).

93.     Alternatively, even if the pollution in and from the drainage ditch system did not require a permit, defendant DOH is breaching its public trust duties under Haw. Const. XI, §§ 1 and 6, H.R.S. § 342E-3, and H.A.R. § 11-54-1.1(b), by failing to protect nearshore marine and inland waters from nonpoint source pollution.

94.     Regardless of whether the pollution in and from the drainage ditch system constitutes point or nonpoint source pollution, defendant DOH is breaching its public trust duties under Haw. Const. XI, §§ 1 and 6, H.R.S. § 342D-4, and H.A.R. 11-54-1.1(b), by failing to ensure compliance with water quality standards, including those set forth in H.A.R. §§ 11-54-4, 11-54-5.2, and 11-54-6.

PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court:

1.     Enter a declaratory judgment that defendant ADC Director has violated and is violating the CWA by directing, enabling, and allowing ADC to

discharge polluted drainage waters from the drainage ditch system into waters of the United States in the absence of an NPDES permit;

2.     Issue appropriate injunctive relief requiring defendant ADC Director, on behalf of ADC, to immediately apply for, obtain, and comply with the terms of an NPDES permit for the drainage ditch system to prevent further illegal discharges of pollutants;

3.     Impose civil penalties for defendant ADC Director's illegal, unpermitted discharges from the drainage ditch system, through ADC, in the amount of up to $52,414 per day for each violation through the date of judgment herein, pursuant to 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4, tbls. 1-2;

4.     Award plaintiffs the costs of this litigation, including reasonable attorney and expert witness fees, pursuant to CWA section 505(d), 33 U.S.C. § 1365(d);

5.     Enter a declaratory judgment that defendant ADC Director, through ADC, has breached and is breaching his public trust duties by failing to obtain or comply with the terms of a valid NPDES permit, or alternatively, by failing to protect nearshore marine and inland waters from its nonpoint source pollution; and by violating state water quality standards;

6.     Issue injunctive relief requiring the ADC Director, on behalf of ADC, to immediately apply for, obtain, and comply with a terms of a valid NPDES

permit for the drainage ditch system, or alternatively, reduce, control, and mitigate its nonpoint source pollution; and comply with state water quality standards;

7.    Enter a declaratory judgment that defendant DOH has been breaching and continues to breach its public trust duties by aiding, abetting, and facilitating the ADC Director's failure to obtain, on behalf of ADC, an NPDES permit, or alternatively, by failing to protect nearshore marine and inland waters from nonpoint source pollution; and by failing to ensure compliance with state water quality standards;

8.    Issue injunctive relief requiring DOH to direct the ADC Director to, on behalf of ADC, promptly apply for, obtain, and comply with the terms of a valid NPDES permit, or alternatively, requiring DOH to reduce, control, and mitigate nonpoint source pollution; and requiring DOH to ensure compliance with state water quality standards;

9.    Retain continuing jurisdiction to review defendants' compliance with all judgments entered herein;

10.    Issue such additional judicial determinations and orders that are necessary to effectuate the foregoing requests for relief;

11.    Issue such other and further relief as the Court deems just and appropriate.

DATED:  Honolulu, Hawaiʻi, January 5, 2018.


/s/ Paul H. Achitoff
PAUL H. ACHITOFF
KYLIE W. WAGER CRUZ
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawaiʻi 96813

Attorneys for Plaintiffs