UNITED STATES DISTRICT COURT

DISTRICT OF HAWAIʻI

| | |
|---|---|
| NA KIAʻI KAI, an unincorporated association, SURFRIDER FOUNDATION, a non-profit corporation, and PESTICIDE ACTION NETWORK NORTH AMERICA, a non-profit corporation,<br><br>      Plaintiffs,<br><br>  v.<br><br>JAMES NAKATANI in his official capacity as Executive Director of the STATE OF HAWAIʻI AGRIBUSINESS DEVELOPMENT CORPORATION,<br><br>      Defendant. | CIVIL NO. 18-00005 DKW-RLP<br><br>**ORDER RE: SUMMARY JUDGMENT AND DISMISSAL** |

**INTRODUCTION**

Plaintiffs Na Kiaʻi Kai, Surfrider Foundation, and Pesticide Action Network

North America (Plaintiffs) seek injunctive and declaratory relief for alleged

violations of the Clean Water Act (CWA), 33 U.S.C. §§1251-1311(a), and breach

of public trust under Haw. Const. art. XI §§1, 6, as a result of discharges from the

Mānā Plain near Kekaha, Kauai, Hawaii into the Pacific Ocean.   Plaintiffs seek

summary judgment on both claims, while Defendant Nakatani, as Director of the

State of Hawaiʻi Agribusiness Development Corporation (ADC or the State), seeks summary judgment on the CWA claim and dismissal of the public trust claim. Plaintiffs also seek to strike an expert report filed by the State as part of its summary judgment briefing.

For the reasons set forth below, Plaintiffs' Motion for Summary Judgment is GRANTED IN PART as to the CWA claim but DENIED as to the public trust claim. The State's Motion for Partial Summary Judgment as to the CWA claim is DENIED, but the Motion to Dismiss the public trust claim is GRANTED. Plaintiffs' Motion to Strike is DENIED as moot.

## FACTUAL BACKGROUND

*The Area*

The Mānā Plain on Kauaʻi's western coast contains naturally-occurring wetland areas that have been drained for agricultural production. Defendant's Concise Statement of Facts in Support of Motion for Partial Summary Judgment (Defendant SOF), Dkt. No. 56, ¶1-2; Plaintiffs' Concise Statement in Opposition to Motion for Partial Summary Judgment (Plf. Opp. SOF), Dkt. No. 66, ¶2. To drain the area, a system of unlined drainage canals was built below the natural water table to draw water out of the wetlands. To avoid water standing in the

drainage canals, pumps were installed to draw water through the canals, lift the water up and over coastal dunes, and pump it into the ocean. *Id.* This drainage system consists of forty miles of earthen, unlined canals and ditches, two pumping stations at Kawaiʻele and Nohili, and six outfalls where water discharges from the canal system into the Pacific Ocean. Plaintiffs' Concise Statement of Facts in Support of Motion (Plaintiff SOF), Dkt. No. 52, ¶2. In addition, in order to discharge water from some of the outfalls, excavators are used to open sand berms and allow water from the canals to drain into the ocean. *Id.* ¶¶3, 5.

This century-old drainage system, originally built for a sugar mill operated by the Kekaha Sugar Company (KSC), has been controlled and managed by ADC since 2001. Defendant SOF ¶5. The 7000-acres of Mānā Plain land controlled and managed by ADC now contains several operations, including the Pacific Missile Range and various commercial facilities. Defendant SOF 3; Plaintiffs' Motion for Summary Judgment, Dkt No. 51, (Plf. MSJ), at 14. In addition, the town of Kekaha is located in the Mānā Plain. *Id*.

The Mānā Plain borders the Pacific Ocean for approximately nine miles. Plf. MSJ at 8. The adjacent ocean waters are used extensively for recreation, including for fishing and swimming. *Id*., 14. In 2014 and 2018, the Hawaiʻi

Department of Health reported to the EPA that the waters in popular beaches in the area were not meeting state water quality standards, threatening the designated uses of the water. *Id.,* Hawai'i Water Quality Monitoring Report (2014 and 2018), Ex. 37-38.

*The CWA and NPDES permits*

Except where authorized by a National Pollutant Discharge Elimination System (NPDES) permit, the CWA bans the discharge of pollutants into waters of the United States ("WOTUS"). The NPDES permit system requires regulating, monitoring, and public reporting of pollutants discharged into such waters. 40 C.F.R. §122. The EPA administers the NPDES permit system but authorizes states that meet minimum requirements to stand in its shoes. FAC ¶6 (citing 33 U.S.C. §1342; 40 C.F.R. §23.24). DOH administers the NPDES permitting system in Hawai'i. Answer, Dkt. No. 18, ¶18.

In 2008, the EPA promulgated the Water Transfer Rule (WTR), which created a new exemption from NPDES permitting requirements where a water transfer activity (WTA) "conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use" and does not add pollutants to the water. 40 C.F.R. §122.3(i).

As the operator of the Mānā Plain drainage ditch system (the System), KSC obtained an NPDES permit, which regulated the discharge of pollutants from the System into the Pacific Ocean.   Defendant's Concise Statement in Opposition (Def. Opp. SOF), Dkt No. 68, ¶9.   ADC assumed ownership of the System and its NPDES permit in 2001, administratively extending the permit until 2011 when it submitted an NPDES renewal application.   Defendant SOF ¶6; FAC ¶60.

In 2015, ADC withdrew its application to renew the System NPDES permit in reliance on the WTR exemption.   *Id*. ¶61.   As of August 3, 2015, ADC has been without an NPDES permit for the drainage ditch system, which continues to discharge waters into the Pacific Ocean.   FAC ¶16; Answer ¶2.

*The Pollution*

The System collects groundwater and surface waters, including stormwater from ADC's agricultural tenants and stormwater and groundwater containing pollutants from ADC's non-agricultural tenants, and discharges those waters to the nearshore waters of the Pacific Ocean.   Plaintiff SOF ¶14.   Several of ADC's tenants who sublicense land adjacent to the drainage ditches pollute water that enters the drainage ditch system.   *Id*. 17-20.   For example, Shredco permits runoff containing pesticides from its green waste material processing operations to

enter the drainage ditch system.   Plaintiff SOF ¶18.   Another ADC sublicensee, Pohaku, runs a mining and rock crushing operation that emits stormwater runoff, which flows into the System.   Plaintiff SOF ¶19.

The Kawaiʻele Outfall is the most active of the System's six.   Alone, it discharges millions of gallons of water every day from the System into the Pacific Ocean.   Plaintiff SOF ¶4.   Other System outfalls similarly discharge into the nearshore marine waters within three miles of the coast, occasionally requiring the movement of sand berms by excavator before doing so.   *Id.* at ¶¶4, 13.   These discharged waters contain sediment and sand from the drainage ditch system, as well as chemicals that seep into the drainage ditch system, including amniomethylphosphonic acid (AMPA), a degradate of glyphosate; dichlorodiphenyldichloroethylene (DDE), a degradate of dichlorodiphenyltrichloroethane (DDT); glyphosate, ametryn, atrazine, bentazon, chlorpyrifos, cispropiconazole, diuron, fipronil, hexazinone, MCPA, metolachlor, prometryn, propoxur, simazine, and trans-propiconazole.   *Id.* ¶¶8-9.   These waters also contain phosphorus, metals (arsenic, barium, cadmium, chromium, copper, lead, mercury, nickel, silver, zinc), sulfide, phenols, antimony, beryllium, selenium, thallium, and bis-phthalate.   *Id.* ¶11.

6

# PROCEDURAL BACKGROUND

On January 16, 2018, Plaintiffs filed a First Amended Complaint (FAC) alleging violations of the CWA and of the public trust by ADC.[1]   Dkt. No. 9.   On April 3, 2019, Plaintiffs filed a Motion for Summary Judgment (Plf. MSJ).   Dkt. Nos. 51-54.   On the same day, Defendant filed a Motion for Partial Summary Judgment and Motion to Dismiss (Defendant MSJ).   Dkt. Nos. 55-58.   These Motions have been fully briefed.   Dkt. Nos. 65, 67, 71, 72.   On May 5, 2019, Plaintiffs filed a Motion to Strike, for which briefing is also complete.   Dkt. Nos. 63, 74, 75.   On May 22, 2019, the Court held a hearing on the cross-motions for summary judgment, Defendant's Motion to Dismiss, and Plaintiffs' Motion to Strike.   Dkt. No. 77.   This disposition follows.

# LEGAL STANDARDS

*Motion for Summary Judgment*

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any

---

[1]The FAC also named as a Defendant Hawai'i Department of Health Director, Virginia Pressler. Ms. Pressler has since been dismissed from this action pursuant to this Court's July 2018 Order (Dkt. No. 37) granting Defendant's Motion to Dismiss (Dkt. No. 14).

material fact and the movant is entitled to judgment as a matter of law." The moving party is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of a claim in the case on which the non-moving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In assessing a motion for summary judgment, all facts are construed in the light most favorable to the non-moving party. *Genzler v. Longanbach*, 410 F.3d 630, 636 (9th Cir. 2005).

*Motion to Dismiss*

Federal Rule of Civil Procedure 12 allows a defendant to move for dismissal of a claim on the grounds of, *inter alia*, lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(1), (6). "Although sovereign immunity is only quasi-jurisdictional in nature, Rule 12(b)(1) is still a proper vehicle for invoking sovereign immunity from suit." *Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2015).[2] A defendant may,

---

[2]*Cf. Sato v. Orange Cty. Dep't of Educ.*, 861 F.3d 923, 927 (9th Cir.), *cert. denied*, 138 S. Ct. 459 (2017) ("A sovereign immunity defense is 'quasi-jurisdictional' in nature and may be raised in either a Rule 12(b)(1) or 12(b)(6) motion.") (citing *Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2015), and *Eason v. Clark Cty. Sch. Dist.*, 303 F.3d 1137, 1140 (9th Cir. 2002)).

however, be found to have waived sovereign immunity if it does not invoke its immunity in a timely fashion and takes actions indicating consent to the litigation. *See id.*; *Hill v. Blind Indus. & Servs. of Md.*, 179 F.3d 754, 760 (9th Cir.), *amended on denial of reh'g*, 201 F.3d 1186 (9th Cir. 1999).

## **DISCUSSION**

### I.     **Motion for Summary Judgment**

Plaintiffs' first count alleges ADC has violated the CWA by discharging pollutants via its drainage ditch system into the waters of the United States without an NPDES permit since August 2015.   FAC at 1.   Plaintiffs further assert that Nakatani, as director of ADC, ordered ADC to do so.   *Id.*   Both sides have filed cross-motions for summary judgment on this claim.   Dkt. Nos. 51, 55.

ADC asserts that despite the System operating pursuant to an NPDES permit for decades, no NPDES permit is needed now because of the Water Transfer Rule. According to the State, the drainage ditches that comprise the System -- like the Pacific Ocean -- are Waters of the United States (WOTUS), the System pumps at Nohili and Kawaiʻele are water transfer activities (WTA), and the WTR exempts WTAs between two WOTUS from NPDES permit requirements.   Defendant's Opposition to Plaintiffs' Motion for Summary Judgment (Def. Opp), Dkt. No. 68,

at 19.   Plaintiffs do not agree. They respond that (1) the System is not a WOTUS, and the WTR therefore does not apply; (2) the WTR does not apply even if the System transfers water between two WOTUS because pollutants are added to the water during the WTA; and (3) the WTR is invalid.   Plaintiffs' Opposition to Defendant's Motion for Partial Summary Judgment, Dkt. No. 65 (Plf. Opp.) at 1-2.

The Court need not reach Plaintiffs' third argument because the first and second are dispositive: the System does not involve transfers between WOTUS and, regardless, the addition of pollutants during the would-be WTA excepts it from applicability of the WTR exemption.   Plaintiffs' Motion for Summary Judgment is therefore GRANTED with respect to Count I, and Defendant's Motion for Partial Summary Judgement is DENIED.

A.   *The CWA Violation*

Plaintiffs assert that ADC's discharge of water from the System into the Pacific Ocean meets all five elements of a CWA violation.   Plf. MSJ at 23. These five elements include: (1) a discharge (2) of pollutants (3) into navigable waters (4) from a point source (5) without an NPDES permit.   *Id*.   ADC disputes that element four has been satisfied, arguing that under the applicable definitions, the System is not a point source of pollution but rather a navigable waterway that is

therefore a WOTUS.   Def. Opp. at 9-14.   As a WOTUS, the System is

considered a "donor water," and the pollutants that ADC discharges into the

"receiving waters," the Pacific Ocean, are exempt from NPDES permit

requirements by the WTR.   *Id.*, at 19.

Plaintiffs have established, and ADC admits, that ADC discharges water

from the System via the Kawaiʻele Outfall into the Pacific Ocean.   *Id.*, at 2.

Indeed, ADC discharges millions of gallons of water daily from Kawaiʻele.   Plf.

MSJ at 23 (citing Ex. 31, Kurano Deposition).   Several other System outfalls

discharge intermittently.   Defendant's Motion for Partial Summary Judgment

(Def. MSJ), Dkt. No. 55, at 12.   Four outfalls "drain into the nearshore marine

waters along West Kauaʻi by opening sand berms in the outfalls with an

excavator."   Plf. MSJ at 24 (citing Ex. 34, ADC Standard Operating Procedure).

Plaintiffs have easily shown the first element of a CWA violation.

Plaintiffs have also met element two, that the discharged waters contain

pollutants.   The CWA defines pollutants as, among other things, "chemical waste,

biological material… rock, sand…industrial, municipal, and agricultural waste…"

33 U.S.C. §1362(6).   Sediment is also a pollutant.   33 U.S.C. §1314(a)(4);

*Natural Res. Def. Counc. v. U.S. EPA*, 863 F.2d 1420, 1424 n.4 (9th Cir. 1988).

The System carries groundwater and stormwater runoff through unlined canals and ditches where it gathers sediment and dirt. Plf. MSJ at 25-26 (citing Ex. 21, Bond Decl.) Plaintiffs have also shown that the water in the System contains pesticide residue, heavy metals and toxins.[3] Plf. MSJ at 26-28. ADC's own sampling shows the presence of chlorophyll, nitrogen, ammonia nitrogen, and nitrate-nitrite, which are all pollutants. *Id.*, Ex. 33, ADC Daily Monitoring Results. And ADC's own NPDES Renewal Application indicates that the drainage water contains "suspended solids" which are understood to be sediment. *Id.,* NKK004442. Even the groundwater itself that flows into and through the System is considered a pollutant under the CWA because its pH differs from that of the Pacific Ocean into which it discharges. *See Nat. Res. Def. Council, Inc. v. U.S. E.P.A.,* 863 F.2d 1420, 1424 (9th Cir. 1988) (citing 33 U.S.C. § 1314(a)(4)

---

[3]ADC quibbles with Plaintiffs' characterization of the water quality survey results (Dkt. No. 53, Ex. 40). Def. Opp. SOF ¶1. ADC argues that water quality tests were conducted on water in the drainage ditch near the Kawaiʻele Pump Station, rather than in the Pacific Ocean, and therefore do not reflect the resulting level of pollutants in the ocean. *Id.*; Dkt. No. 53, Ex. 19 at 18. However, ADC does not dispute that the water in the drainage ditch is polluted at the levels the State's water quality report indicates nor does ADC dispute that the water, polluted as it is, is discharged into the Pacific. As such, the distinction appears to be of little consequence. Of note, the absence of information regarding levels of pollution at the outfalls is exactly the information vacuum that would be remedied if ADC was required to obtain an NPDES permit.

(1982)).   Further, Plaintiffs' expert hydrologist concludes that, because of the

structure of System, groundwater flowing to the drainage ditch is likely

contaminated with seepage from a nearby landfill and domestic cesspools outside

the Mānā Plain.   Plf. MSJ at 19.   Although ADC challenges the characterization

of the extent of the pollution, it does not dispute that the second element of a CWA

violation is met.

Third, Plaintiffs assert that the nearshore area of the Pacific Ocean

surrounding Kaua'i is a navigable waterway and is protected under the CWA.

*See* 33 U.S.C. §§1362(7-8).   Notably, the polluted water discharges from the

drainage ditch into the Pacific Ocean in an area containing popular beaches used

for water recreation, including Barking Sands Beach and Kekaha Beach Park.

Plf. MSJ at 14.   The third element is therefore also met.

It is undisputed that, since 2015, ADC has been without an NPDES permit

for its discharge of waters from the System into the Pacific Ocean.   Def. MSJ at

4; Answer ¶¶2, 7.   Element five has therefore also been met.

B.     *The System Is Not a WOTUS*

The parties disagree on the fourth element of a CWA violation, which

requires a point source of pollutants.   Under Plaintiffs' theory, the System is a

point source of pollution. Plaintiffs assert that "the System and its outfalls fall under the express definition of 'point source' because they are 'discernible, confined and discrete conveyance[s],' and are 'ditch[es] [or] channel[s],' which the Clean Water Act expressly defines as point sources." Plf. MSJ at 31 (quoting 33 U.S.C. §1362(14)). Forty years of NPDES permitting support Plaintiffs' assertion that the System is a point source of pollution.

Under ADC's theory, the System is not a point source of pollution. ADC asserts that, notwithstanding the decades of classifying the System as a point source, the proper classification of the System is as a WOTUS or jurisdictional water under 40 C.F.R. §122.2. Specifically, ADC asserts that, based on an EPA consultant's determination, the water in the drainage ditch system should be considered a protected WOTUS, rather than a point source of pollutants into the ocean. Def. Opp. at 14 (citing Hayes Decl. ¶24-25).[4] ADC explains that, because there is no longer a single point source of industrial pollution (the KSC sugar mill) entering the drainage ditch system, the drainage ditch is now properly treated as its own protected waterway under the CWA. Thus, in ADC's view,

_____

[4]Plaintiffs have moved to strike the Hayes Declaration.

some of ADC's sublicensees' activities may be point sources of pollution requiring NPDES permits,[5] but the System itself is not a point source of pollution to the ocean. According to ADC, Hawai'i DOH agreed and, following ADC's consultant's direction, reclassified the System as a "receiving water" that should be considered a "state jurisdictional water" such that industrial point-source pollution should be regulated as it enters the System.[6] Def. Opp. SOF ¶9; Def. Opp. at 5.

This reclassification of the System from a point source to a WOTUS is suspect for several reasons. First, treating the drainage ditch system as a WOTUS or jurisdictional water does not comport with the history of the System's use and regulation. Second, the change in how the System is classified is not justified by any intervening change in law or relevant change in circumstances. Third, the reclassification of the System as a WOTUS undermines the purpose of the CWA.

---

[5]Under the CWA, agricultural irrigation return flows do not qualify as a point-source of pollution. CWA §402(1)(1-2); CWA §502(14). Thus, many of ADC's tenants do not require NPDES permits for the pesticide-laden runoff that enters the ditch system. Plaintiffs argue that mixed with this agricultural runoff is industrial stormwater runoff that does require a permit. Plaintiff SOF ¶18. Plaintiffs, for instance, allege that Pohaku is an industrial point source and the HDOH has required them to obtain an NPDES permit, which they have failed to do. *Id.* ¶19. That dispute need not be resolved here.
[6]Plaintiffs dispute whether Hawaii DOH has in fact made that determination and, if it has, whether the determination is even proper for consideration here. Plf. Reply at 6.

The history and use of the System indicate an origin, role and purpose entirely different from those waterways protected under the CWA. The drainage ditches were built to create agricultural land from a previously existing wetland. Defendant SOF ¶¶2-4. This System was created, in other words, so that KSC could use the land to produce sugar. The canals and water pumps were used to carry the drained water to the Pacific Ocean so that the polluted water would not stand in or overflow the ditches. *Id.*

For decades, the System was regulated as such. During the many decades of the existence of the drainage ditches and water pumps draining polluted water from the Mānā Plain into the Pacific Ocean, KSC obtained NPDES permits for the System. Plf. MSJ at 20. Those NPDES permits regulated the discharge of the System's waters *into the ocean*.[7] Def. Opp SOF. ¶9. KSC, as operator of the System, was not required to regulate its discharge of pollutants at the point at which they entered the drainage ditch system. *Id.* The history of permitting indicates that the System was viewed as a means of transporting polluted discharge

_____

[7]Defendant's Statement of Facts here relies on the Hayes Declaration which Plaintiffs moved to strike. However, the basis of the Motion to Strike is not this fact and in any case the Motion to Strike is moot.

into the Pacific Ocean and was viewed in its totality as the point source of pollution, not as a protected, navigable waterway.   Recognizing the System for what it is—a series of drainage ditches carrying polluted waters—the State regulated the point at which the System discharged into the waterway the State *did* seek to protect: the Pacific Ocean.

Nothing about the subsequent change in ownership in 2001 from KSC to ADC indicates that the System, which has remained structurally unchanged, should now suddenly be treated as a WOTUS, navigable waterway, or jurisdictional water.   Nothing about the structure of the drainage ditches, canals and water pumps has changed since ADC took over from KSC as the operator of the System.

What has changed is the use of the surrounding land, with the proliferation of sources of pollution from one company (KSC) to many companies as sublicensees of KSC's successor (ADC).[8]   But this change in land use and owner does nothing to change the structure of the System itself.   Just as was the case during KSC's operational years, some of the surrounding businesses (now ADC's

---

[8]Notably, even during the time of KSC's operation of the System, various commercial uses of the land surrounding the System already existed.   Defendant SOF ¶3.

sublicensees) may not add pollutants to the System, some may add pollutants to the System via exempt means (such as agricultural irrigation return flow), and some may add pollutants through non-exempt means (such as industrial runoff from Pohaku and, previously, KSC). But the nature of ADC's use of the land (through its sublicensees) has not changed the nature of the System and therefore provides no logical support for reclassifying the System from a point source of pollution to a WOTUS.

ADC argues that its classification of the System as a WOTUS is supported by state and federal law. Citing to the CWA and various cases, ADC varyingly argues that the drainage ditches are "canals," "navigable waters," and "tributaries," and that they have a "significant nexus" to jurisdictional waters, such that they are themselves WOTUS. Def. Opp. 12-17. ADC also asserts that the State has classified the System as a State Water and argues that such classification in the State translates into a classification of the System as a WOTUS under the CWA. Def. MSJ at 8-9. Plaintiffs dispute whether the System satisfies any of the definitions of WOTUS offered by ADC. Plaintiffs' Reply in Support of Motion for Summary Judgment (Plf. Reply), Dkt. No. 71, at 3-5. Citing extensive case law, Plaintiffs argue that the groundwater drawn into the System precludes

classification as a WOTUS and that the State's capacious definition of a State Water is inconsequential to the federal definition of a WOTUS. *Id.*

The Court need not resolve the ultimate question of whether the drainage ditch system operated here could ever be classified as a WOTUS because, while the law, as cited by ADC, may allow certain drainage ditch systems to be considered WOTUS, it does not require the Court to disregard how this System has historically been classified and regulated, and what it, in fact, is: a means to convey and discharge polluted water into the Pacific. In more than forty years of NPDES regulation, the System has never been treated as a WOTUS. In the several decades of NPDES regulation, no effort was ever made to regulate the level of pollution entering the System, as would be required if it were a WOTUS under the CWA; no effort was made to keep the System's waters in a usable condition either. The cases and statutory definitions cited to by ADC that indicate a system of drainage ditches *could be* a WOTUS predate ADC's first application to renew the System NPDES permit, such that those definitions could have been relied upon to argue for the System to be treated as a WOTUS. *See* Def. Opp. at 9-17 (citing *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001); *North Carolina Shellfish Growers Assoc v. Holly Ridge Assocs.,* LLC., 278

F.Supp.2d 654, 672 (2003). Yet neither ADC nor Hawaiʻi DOH ever sought to

do so, and indeed, ADC's withdrawn NPDES renewal application can easily be

viewed as advancing the same position on the applicability of the CWA as that

advanced by Plaintiffs here. *See* ADC NPDES Renewal Application, February

25, 2011, Dkt. No. 53-4.

No intervening change in the WOTUS definition warranted ADC and

Hawaiʻi DOH's efforts to reclassify the System either. The only arguably

relevant regulatory change that did occur was the promulgation of the EPA's WTR

in 2008, which exempts polluted waters transferred into a receiving WOTUS from

requiring an NPDES permit, *but only if the donor water is itself a WOTUS*. Plf.

Reply at 8 (citing 40 C.F.R. 122.3(i) ("water transfer means activity that conveys

or connects water of the United States[…]")). The State's reclassification of the

System as a WOTUS seeks solely to take advantage of the WTR exemption. The

reclassification, in other words, appears opportunistic, rather than factually based,

especially where, as here, ADC seeks to twist a law intended to protect waterways

to do exactly the opposite.

Importantly, it is Defendant's burden to show that its pollutant-laden

discharge from the System falls under an exemption to the CWA. *See N. Cal.*

20

*River Watch v. City of Healdsburg*, 496 F.3d 993, 1001 (9th Cir. 2007), cert.

denied, 552 U.S. 1180 (2008) (burden on polluter to prove applicability of

regulatory exemption from "waters of the United States"); *United States v. Akers*,

785 F.2d 814, 819 (9th Cir.), cert. denied, 479 U.S. 828 (1986) (the burden falls on

the polluter to prove its activities are statutorily exempt from Clean Water Act

Section 404, 33 U.S.C. § 1344).   ADC's unfounded claim that the System has

suddenly changed from a point source of pollution to a WOTUS without any

intervening changes to the definition of a WOTUS, to the interpretation of the

definition, or to the physical structure or function of the System itself, does not

satisfy this burden.

Finally, ADC offers that "HDOH's determination that the Canals are the

receiving Jurisdictional Water" cannot be contradicted here without bringing suit

against HDOH.   Def. Opp. at 17-18.   ADC's argument relies on a convoluted

interpretation of Plaintiffs' claims, treating Plaintiffs' argument that no exemption

to the NPDES permit requirement applies as a challenge to the State's law defining

State jurisdictional waters.   Plaintiffs make no such challenge to the State's laws,

and the Court need not address such a hypothetical.

Moreover, the potential conflict between the instructions and demands of State permitting authorities and this Court's Order suggested by ADC are not proper for consideration here.   This Court is not limited in its authority to evaluate CWA violations by the State's laws.   *Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1012 (9th Cir. 2002).   While an agency determination is ordinarily afforded deference in some circumstances, ADC has nowhere shown an EPA determination at all—rather, ADC has suggested what the EPA's views might be via ADC's reliance on a contractor's opinion.   Plf. Reply at 7; Def. Opp at 4 ("the contractor's assessment was that an NPDES permit was no longer necessary, as there was no longer an industrial point source discharging.").   If the State's interpretation of its own laws create a conflict with CWA jurisprudence, or the EPA later makes a determination about the need for an NPDES permit, and those determinations put ADC in an impossible position, that conflict can be resolved by ADC at a later time.

C.      *The WTR Does Not Apply Because of the Added Pollutant Exception*

Building on the unsound premise that the System is a WOTUS, ADC argues that "any discharge from the Canals into the Pacific Ocean is a water transfer from Jurisdictional Water into another.   By definition, this activity does not require a

22

NPDES permit." Def. Opp. at 4 (relying on the EPA's WTR). According to the State, the WTR, codified at 40 C.F.R. §122.3, allows transfers of water from one WOTUS to another without an NPDES permit, even where it might transfer "the most loathsome navigable water in the country into the most pristine one." Def. Reply at 10 (quoting *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1226 (11th Cir. 2009).

However, even assuming, *arguendo*, that the System and the Pacific Ocean into which it discharges are both WOTUS, the transfers at issue here are not exempt under the WTR because *pollutants are added during the transfer.* 40 C.F.R. §122.3(i)(the water transfer exclusion "does not apply to pollutants introduced by the water transfer activity itself to the water being transferred.").

Here, it is uncontested that the System's "forty miles of unlined, earthen drainage ditches add pesticide-laden sediment to the transferred waters…" Plf. Opp. at 2; Answer ¶16; Plaintiff SOF ¶¶7-8;[9] Dkt. No. 53 (Plf. Ex. 25: ADC

---

[9]Although ADC disputes SOF ¶¶7-8, it does so only to the extent that the statements suggest that the samples taken from the drainage ditches surrounding the outfalls, which show the presence of pesticides, were actually taken from the Pacific Ocean. Def. Opp SOF ¶1. These facts are here used only to support the assertion that the drainage ditches themselves add pesticide-laden sediment to the water. ADC did not object to the statement that "the discharge waters contain sediment from the banks and bottoms of the Mānā Plain Drainage Ditch System." Plaintiff SOF

NPDES Permit Renewal Application (Feb. 25, 2011) at NKK004444-NKK00444540; Ex. 39: Alfredo Lee Letter (Nov. 28, 2011) at ADCID000143-ADCID000174, ADCID000179-ADCID000180, ADCID000190-ADCID000191; Ex 40: Statewide Pesticide Sampling Project, at NKK000215); Dkt. No. 52 (Bond Decl. ¶¶140-145; Ex. 21: Erosion Images); First Amended Complaint ¶74.   ADC instead argues that the proper conception of the water transfer activity is not to look at the entire System, including those forty miles of unlined ditches through which pollutants are added, but rather to focus on the two pumps at Kawaiʻele and Nohili.   Def. Reply at 11-12.   Based on this conception of the WTA, ADC argues that the proper inquiry is whether those pumps add pollutants to the transferred water.   *Id.*   ADC asserts they do not.   *Id.*

ADC has the burden of proving that it is eligible for an exemption to the CWA.   *United States v. First City Nat'l Bank of Houston*, 386 U.S. 361, 366 (1967) (holding that a party claiming an exception must prove that they acted within the exception).   Further, the Court must narrowly construe "claims of an

_____

¶7.   Moreover, in its Answer, ADC admits to FAC ¶74, which states that, "ADC [] self-reported testing results to DOH on or about November 28, 2011. The testing results show the presence of [numerous pollutants] at the Nohili Outfall and Second Ditch."   *See* Answer ¶16.

exemption, from the . . . permitting requirements of the [CWA's] broad pollution prevention mandate . . . to achieve the Act's purpose." *N. California River Watch v. City of Healdsburg,* 496 F.3d 993, 1001 (9th Cir. 2007).

Plaintiffs argue that the ditches, the water pumps that draw water through these ditches and pump it into the Pacific Ocean, and the excavation of the sand berms that allows water to flow into the Pacific Ocean should all be viewed collectively as the water transfer activity. Plaintiffs here rely on the plain language of the statute describing a WTA as an "engineered activity" to argue that ADC has failed to establish that the entire engineered System should not be considered part of the WTA. In furtherance of that argument, Plaintiffs have shown via expert testimony, and ADC does not dispute, that the unlined ditches were purposefully built below the natural water table at Mānā Plain to draw water from the surrounding wetlands into the ditches, and the pumps at the end of these ditches then draw that water from throughout the forty-mile system into the Pacific Ocean. And because these miles of "unlined, earthen canals" are "integral parts of the [WTA]" and the "unvegetated and unstable banks are sources of detached sediment […] contaminated with pesticides[…,]" that System is not an exempt WTA because it adds pollutants. Plf. Opp. at 14-17. Plaintiffs' construction is

surely the proper, and, indeed, the only sensical one.   The pumps focused on by the State have no water to draw, move, or ultimately discharge without the ditches purposefully built to first collect that water.   That logically leads to the conclusion that the entire System represents the water transfer activity, not the pumps studied in isolation.

Certainly, ADC offers citations to ambiguous regulatory language in which the EPA refers to a water transfer "facility" or "structure" to suggest that the EPA itself intended the term WTA to apply only to an *isolated* structure.   Def. Reply at 12 (quoting *National Pollutant Discharge Elimination System (NPDES) Water Transfers Rule*, 73 FR 33697-01, at 33704.).   If that were true, the regulation at Section 122.3, or elsewhere, could have said so.   It strains credulity, however, to interpret a water transfer activity to mean only a pump or other single structure when the "engineered activity" clearly involves much more than that.

Moreover, as ADC itself identifies, in promulgating the WTR, the EPA described a WTA, stating, "[t]ypically water transfers route water through tunnels, channels, and/or natural stream water features, *and* either pump or passively direct it for uses such as[…] flood control."   Def. Opp. at 20 (quoting Federal Register, vol. 73- 115, at 33697 (June 13, 2008)) (emphasis added).   The structure of the

sentence suggests that the channels through which water passes and the pumps that move and discharge it are *collectively* considered the water transfer.   There is nothing in the language of the rule or EPA's explanation of the rule that suggests the forty miles of unlined ditches and canals at issue here should be excluded from consideration as part of the WTA.   In fact, the rule appears to contemplate those exact structures, to include pumping stations, pipes, canals and other structures "used solely to facilitate the transfer of water," as WTAs.   *Id*. at 33704

The sole case upon which ADC relies for its crabbed view of the WTA is a non-controlling Eleventh Circuit case applying the WTR.   Def. Reply at 12.   In *Friends*, the court was similarly faced with a system of canals and a water pump facility pumping polluted water into Lake Okeechobee.   *Friends of Everglades v. S. Fla. Water Mgmt. Dist.,* 570 F.3d 1210, 1222 (11th Cir. 2009).   ADC relies on *Friends* to argue that the pumps alone are the WTA because the canals that were part of the system in *Friends* were treated as WOTUS, such that the only activity transferring water between two WOTUS—and therefore the only WTA at issue— were the pumps.   But nothing in the holding in *Friends* indicates that the court there was asked to parse the meaning of a "water transfer activity" or to determine whether the canals were WOTUS.   Indeed, in *Friends,* the court stated, "it is

undisputed that . . . Lake Okeechobee *and the canals* are 'navigable waters." *Id.*
at 1216 (emphasis added).   In light of that undisputed fact, the court's treatment
of the canals as the donor WOTUS and the pumps as the WTA is of little
assistance in defining the proper limits of the WTA under the circumstances
presented here.   Here, unlike in *Friends,* the status of the ditches as WOTUS is
heavily disputed.   And nothing in the opinion suggests that the history or structure
of the system of canals and pumps in *Friends* resembles the System here, such that
it can readily answer the question of whether the ditches are properly considered
WOTUS or part of the WTA (or both).   ADC has provided no Ninth Circuit case
law to support its proposed interpretation of the WTA to exclude the pollutant-
adding canals and drainage ditches.

With competing definitions of WOTUS and WTA, and little authority cited
to offer guidance, the Court cannot find that ADC has satisfied its burden of
proving that an exemption applies under the WTR.   Because the ditches are
logically considered part of the WTA, and because they add pollutants during the
transfer activity, the WTR does not exempt the discharge from the System into the
Pacific Ocean from NPDES permit requirements.

*D.    Conclusion*

The parade of horribles ADC sets forth is unmoving.   ADC claims that

"should the water transfer cease, the Mānā Plain would be inundated with water,

causing extensive adverse effects to the Pacific Missile Range Facility, Kekaha

town residences and commercial businesses, and agriculture and other uses on the

Plain."   Def. Opp. at 3.   Of course, Plaintiffs do not ask the Court to enjoin

ADC's discharge of water from the System; they ask only that the Court require

ADC to obtain an NPDES permit to do so.   Flooding of the Mānā Plain and

military sites is not the proximate outcome of a requirement that ADC resume its

efforts to obtain permits for the activities it previously conducted under NPDES

requirements.   Rather, ADC's compliance with NPDES permitting requirements

will generate more data gathering and facilitate additional public scrutiny of its

water discharges, as was the case prior to 2015.

There is no question that ADC discharges polluted water into the near-shore

waters of the Pacific Ocean off Kauai's western coast on a daily basis via the Mānā

Plain drainage ditch system, and that it does so without an NPDES permit.   It is

undisputed that the water discharged contains various pesticides and agricultural

chemicals, byproducts of agricultural chemicals, and heavy metals, as well as

sediment from the unlined canals through which it passes. It is further undisputed that these pollutants include those from which the CWA seeks to protect waterways and that the near-shore waters of the Pacific Ocean are protected under the CWA. Thus, no material facts remain in dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The undisputed facts show that each of the five elements of a CWA violation are present. The undisputed facts also show that the WTR does not apply to exempt the State's conduct from the application of the CWA because pollutants are added to the water flow during the transfer.

The Court GRANTS Plaintiffs' Motion for Summary Judgment on Count I and DENIES Defendant's Counter-Motion on the same.

## II.    Motion to Dismiss

In Count II, Plaintiffs allege that the same conduct on which their CWA claim is based also amounts to the State's violation of its public trust duties under the Hawaiʻi State Constitution, Article XI; Hawaiʻi Revised Statutes ("HRS") § 342D-4; and Hawaiʻi Administrative Rules ("HAR") § 11-54-1.1(b). Plaintiffs move for summary judgment on this Count, arguing that "ADC has violated and continues to violate its public trust duties… by failing to conserve and protect the nearshore marine waters along West Kauaʻi." Plf. MSJ at 43. ADC moves to

dismiss this claim for lack of subject matter jurisdiction.   Def. MSJ at 13.   It argues that because "Plaintiffs have cited to no federal laws or regulations to support their [public trust] claim," ADC has immunity in this Court "under the Eleventh Amendment and the principles of sovereign immunity."   *Id.*

Plaintiffs do not contest the applicability of the Eleventh Amendment to their state-law claims against ADC.   Instead, they assert that ADC expressly waived this defense by not moving to dismiss this count sooner and by "admitting that so long as Plaintiffs' federal claims remain pending, this Court has pendent jurisdiction over Plaintiffs' public trust claim."   Plf. Opp. at 35.

The application of the Eleventh Amendment and principles of sovereign immunity to Plaintiffs' state-law breach of public trust claim against Nakatani in his official capacity is not reasonably disputed.   Because the Court determines that Nakatani has neither expressly waived the defense of sovereign immunity nor implicitly waived it based upon his conduct in this matter, Defendant's Motion to Dismiss Count II is GRANTED.   Plaintiffs' Motion for Summary Judgment as to this Count is DENIED.

## A. Relevant Procedural Background

On January 16, 2018, Plaintiffs filed their FAC, naming Nakatani in his official capacity as Director of ADC and Virginia Pressler in her official capacity as Director of DOH.   Dkt. No. 9.   The FAC included three causes of action: (1) CWA and HRS § 342D-50(a) claims against Nakatani; (2) a breach of public trust claim against Nakatani; and (3) a breach of public trust claim against Pressler. FAC ¶¶28- 29.   Pressler moved to dismiss Plaintiffs' sole claim against her for public trust violations under state law, based upon the State's sovereign immunity. Dkt. No. 26.   Nakatani joined in Pressler's motion.   Dkt. No. 32.   On July 13, 2018, the Court granted Pressler's Motion to Dismiss Count III.   Dkt. No. 37. On April 3, 2019, after the completion of discovery, ADC filed a Motion to Dismiss Count II.   Dkt. No. 54.

## B. Sovereign Immunity Bars State Law Claims Against ADC in Federal Court

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."   U.S. Const. amend. XI.   "A State

32

may waive its sovereign immunity at its pleasure, *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 675–676 (1999), and, in some circumstances, Congress may abrogate it by appropriate legislation.   But absent waiver or valid abrogation, federal courts may not entertain a private person's suit against a State" or its agent sued in his or her official capacity. *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253–54 (2011) (footnote omitted).

Here, the Eleventh Amendment immunizes Nakatani, a state official sued in his official capacity, from state law claims brought in this court.   *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Sato v. Orange Cty. Dep't of Educ.*, 861 F.3d 923, 928 (9th Cir. 2017).   *See* FAC ¶8 ("James Nakatani, in his official capacity as Director Agribusiness Development Corporation [is] breaching [his] public trust duties to conserve and protect water resources, including nearshore marine and inland waters, under article XI, §§ 1 and 6 of the Hawaiʻi Constitution.").   Thus, to the extent Plaintiffs seek declaratory and/or prospective injunctive relief via

their state-law claims against Nakatani, those claims are barred by the Eleventh Amendment, and no exception applies.[10]

## C.    The State Has Not Waived Sovereign Immunity

Plaintiffs do not contest the initial application of sovereign immunity to Count II.   However, they contend that the State waived any such defense through litigation conduct that was incompatible with an intent to preserve that immunity. The Ninth Circuit explains that "Eleventh Amendment immunity is an affirmative defense that must be raised 'early in the proceedings' to provide 'fair warning' to the plaintiff."   *Aholelei v. Dep't of Pub. Safety*, 488 F.3d 1144, 1147 (9th Cir. 2007) (quoting *Demshki v. Monteith*, 255 F.3d 986, 989 (9th Cir. 2001) (quoting *Hill v. Blind Indus. & Servs. of Md.*, 179 F.3d at 761), *amended by* 201 F.3d 1186 (9th Cir. 2000)) (internal citation omitted).   Because such immunity is an affirmative defense, it can be waived.   *Id*.   "The test employed to determine

---

[10]Under the *Ex Parte Young* doctrine, *see* 209 U.S. 123 (1908), a federal court may enjoin a state official's future conduct when a plaintiff brings suit alleging a violation of federal law, *Edelman v. Jordan*, 415 U.S. 651, (1974), but not where, as here, a plaintiff alleges a violation of state law.   *Pennhurst*, 465 U.S. at 106 (stating that "when a plaintiff alleges that a state official has violated state law," then "the entire basis for the doctrine of *Young* ... disappears"); *see also McNally v. Univ. of Hawaii*, 780 F. Supp. 2d 1037, 1056 (D. Haw. 2011) (discussing *Ex Parte Young* doctrine).

whether a state has waived immunity 'is a stringent one.'" *In re Bliemeister*, 296 F.3d 858, 861 (9th Cir. 2002) (quoting *In re Mitchell*, 209 F.3d 1111, 1117 (9th Cir. 2000)). "A state generally waives its immunity when it 'voluntarily invokes [federal] jurisdiction or . . . makes a 'clear declaration' that it intends to submit itself to [federal] jurisdiction.'" *Id*. (quoting *In re Lazar*, 237 F.3d 967, 976 (9th Cir. 2001)) (alterations in original). "Express waiver is not required; a state 'waive[s] its Eleventh Amendment immunity by conduct that is incompatible with an intent to preserve that immunity.'" *Id*. (quoting *Hill*, 179 F.3d at 758).

Plaintiffs offer two justifications for their waiver argument. Neither is persuasive. The State did not sit on its Eleventh Amendment rights, wait until late in the proceedings, or act in a manner inconsistent with an intent to preserve its sovereign immunity. Nor has the State made a clear declaration or otherwise conducted itself in a way to cause anyone to reasonably believe that it intends to submit to federal jurisdiction with respect to Plaintiffs' state-law claims. Plaintiffs' assertions to the contrary are unsupported.

First, the waiver arguments set forth by Plaintiffs here are nearly identical to those set forth in opposition to Pressler's Motion to Dismiss, which this Court

granted.   Dkt. No. 37.   The analysis here does not differ and need not be repeated.

Next, Plaintiffs argue that ADC waived its sovereign immunity defense by waiting to file a Motion to Dismiss ten months after the Court granted Pressler's motion on the same grounds.   Plf. Opp. at 36.   However, in his Motion for Joinder in Pressler's Motion to Dismiss, Nakatani stated that he would be filing a similar motion regarding the state law claims against him in this case.   *Id*. (citing Dkt. No. 32).   There is no unfair delay here because Plaintiffs had ample notice of Nakatani's intent to file the Motion now before the Court.

Moreover, the Court notes that Ninth Circuit case law reflects a clear aversion to finding waiver based on an assertion that sovereign immunity was invoked too late in a proceeding.   Specifically, in *Ashker v. Cal. Dep't of Corr.*, 112 F.3d 392, 394 (9th Cir. 1997), the Ninth Circuit concluded that a sovereign immunity defense had not been waived because it had been raised in the defendants' answer and pretrial statement, even though the defendants did not otherwise litigate the defense in the district court, litigating it for the first time on appeal.   *Ashker* is not an anomaly either.   In *Gamboa v. Rubin*, 80 F.3d 1338, 1350 (9th Cir. 1996), *vacated on other grounds as recognized in Hill v. Blind*

*Indus. & Services of Md.*, 179 F.3d at 763, the State of Hawai'i raised the defense of sovereign immunity only in its answer, and then proceeded to litigate the substance of the case before the district court by filing a motion for summary judgment. The Ninth Circuit, in particularly definitive language, concluded that the State had not waived the defense of sovereign immunity, stating: "That Hawai'i did not raise the issue in the district court except in its answer does not amount to a waiver of immunity." Here, even prior to this Motion to Dismiss, ADC raised its sovereign immunity defense as the "Third Affirmative Defense" in its Answer, stating, "Plaintiffs' claims are barred against ADC under the doctrine of sovereign immunity." Answer ¶31. Another Ninth Circuit case, *Hill v. Blind Indus. & Services of Md.*, 179 F.3d at 763, is equally instructive. In *Hill*, the Ninth Circuit concluded that sovereign immunity *had been waived, but only* because the defense was raised for the first time on the opening day of trial. *Id*. at 763. The defense had never been raised, not even in an answer, prior to that time. Under these far from demanding standards, ADC's sovereign immunity defense is timely.

Further, ADC neither voluntarily invoked federal jurisdiction nor made a "clear declaration" that it intended to submit itself to federal jurisdiction. *Cf. Lapides v. Bd. of Regents of Univ. Sys. of Ga*., 535 U.S. 613, 624 (2002) (holding a

state waived its Eleventh Amendment immunity by removing the case to federal court). Contrary to Plaintiffs' assertion, ADC's statement in its answer that "this Court may exercise supplemental jurisdiction *only if* Plaintiffs' CWA claims remain pending" is not an express waiver of immunity or invocation of federal jurisdiction. Answer, Dkt. No. 18, ¶14. Instead, it is an indication that ADC acknowledged only a limited basis for this Court's jurisdiction. Under these circumstances, the Court will not infer a waiver of sovereign immunity where the facts indicate precisely the opposite intent, based upon the State's conduct in this litigation.

The Motion to Dismiss based on sovereign immunity is timely, and the State neither expressly nor impliedly waived that defense at any time. The Motion to Dismiss Count II is therefore GRANTED.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is GRANTED IN PART with respect to Count I (violation of the CWA) and DENIED IN PART as to Count II (state-law violation of public trust). Defendant's Motion for Partial Summary Judgment on Count I is DENIED. Pursuant to the Eleventh Amendment and principles of sovereign immunity,

Defendant is immune from suit in this court with respect to the breach of public trust claims, and Defendant's Motion to Dismiss Count II is therefore GRANTED. Plaintiffs' Motion to Strike is DENIED as moot.

IT IS SO ORDERED.

DATED: July 9, 2019 at Honolulu, Hawaiʻi.



Derrick K. Watson
United States District Judge

---

*Na Kiaʻi Kai et al. v. Nakatani et al.,* CV. NO. 18-00005 DKW-RLP; **ORDER RE: SUMMARY JUDGMENT AND DISMISSAL**